C. R. KLEWIN NORTHEAST, LLC *v.* CITY OF BRIDGEPORT

CITY OF BRIDGEPORT *v.* C. R. KLEWIN NORTHEAST, LLC
(SC 17590)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued November 30, 2006—officially released April 17, 2007

*Brian J. Donnell*, with whom were *Robert M. Barrack*, and, on the brief, *Steven J. O'Neill*, for the appellant-cross appellee (defendant in the first case, plaintiff in the second case).

*Daniel J. Klau*, with whom were *Timothy T. Corey* and *Richard F. Wareing*, for the appellee-cross appellant (plaintiff in the first case, defendant in the second case).

*Richard Blumenthal*, attorney general, and *Robert B. Teitelman*, assistant attorney general, filed a brief for the state of Connecticut as amicus curiae.

*Marvin P. Bellis* filed a brief for the Connecticut Conference of Municipalities as amicus curiae.

*Michael N. Lavelle* filed a brief for the Connecticut Association of Municipal Attorneys as amicus curiae.

*Opinion*

NORCOTT, J. In this appeal, we consider whether an arbitration panel acting pursuant to the dispute resolution clause of a municipal public works contract has jurisdiction over a claim that the contract is void ab initio because it was procured illegally, and also the extent to which such corruption may form a public policy basis for the subsequent vacatur of an arbitration award. The city of Bridgeport (city), the defendant in the first case and the plaintiff in the second case,

appeals, and C. R. Klewin Northeast, LLC (Klewin), the plaintiff in the first case and the defendant in the second case, cross appeals, from the judgment of the trial court in a consolidated proceeding granting Klewin's application to confirm pursuant to General Statutes § 52-417,[1] and denying the city's application to vacate pursuant to General Statutes § 52-418 (a),[2] an arbitration award resulting from a dispute concerning a contract to build a new sports arena for the city.[3] On appeal,[4] the city claims that the trial court improperly confirmed, and

[1] General Statutes § 52-417 provides: "At any time within one year after an award has been rendered and the parties to the arbitration notified thereof, any party to the arbitration may make application to the superior court for the judicial district in which one of the parties resides or, in a controversy concerning land, for the judicial district in which the land is situated or, when the court is not in session, to any judge thereof, for an order confirming the award. The court or judge shall grant such an order confirming the award unless the award is vacated, modified or corrected as prescribed in sections 52-418 and 52-419."

[2] General Statutes § 52-418 (a) provides: "Upon the application of any party to an arbitration, the superior court for the judicial district in which one of the parties resides or, in a controversy concerning land, for the judicial district in which the land is situated or, when the court is not in session, any judge thereof, shall make an order vacating the award if it finds any of the following defects: (1) If the award has been procured by corruption, fraud or undue means; (2) if there has been evident partiality or corruption on the part of any arbitrator; (3) if the arbitrators have been guilty of misconduct in refusing to postpone the hearing upon sufficient cause shown or in refusing to hear evidence pertinent and material to the controversy or of any other action by which the rights of any party have been prejudiced; or (4) if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made."

[3] The city is the plaintiff in the application to vacate the arbitration award, and is the defendant in Klewin's separate application to confirm the award. Klewin is the defendant in the action to vacate the award, and is the plaintiff in the action to confirm the award. Inasmuch as both actions have been consolidated for purposes of both trial and this appeal, for the sake of clarity and convenience, we refer to the parties as the city and as Klewin.

[4] The city appealed, and Klewin cross appealed, from the judgment of the trial court to the Appellate Court, and we transferred the appeal and the cross appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

should have vacated, the arbitration award because: (1) its claim that the arbitration panel (panel) lacked subject matter jurisdiction because the contract containing the arbitration clause was illegally procured, and therefore void ab initio, is committed to the trial court, and not the panel, in the first instance; (2) even if the panel did have subject matter jurisdiction over the contract illegality claims, it failed to address them, rendering the award incomplete and defective; (3) confirmation of an arbitration award enforcing an illegally procured contract would violate public policy; (4) the city was deprived of its due process right to an evidentiary hearing with respect to the illegality issues raised on its application to vacate the award, and subsequent motion to reargue; and (5) the panel lacked subject matter jurisdiction because a vacancy had resulted in a panel of only two arbitrators, when the parties had agreed on three. In its cross appeal, Klewin claims that the trial court improperly failed to grant its request for offer of judgment interest pursuant to General Statutes § 52-192a.[5] We affirm the judgment of the trial court.

---

[5] General Statutes § 52-192a provides in relevant part: "(a) After commencement of any civil action based upon contract or seeking the recovery of money damages, whether or not other relief is sought, the plaintiff may, not earlier than one hundred eighty days after service of process is made upon the defendant in such action but not later than thirty days before trial, file with the clerk of the court a written offer of compromise signed by the plaintiff or the plaintiff's attorney, directed to the defendant or the defendant's attorney, offering to settle the claim underlying the action for a sum certain. The plaintiff shall give notice of the offer of compromise to the defendant's attorney or, if the defendant is not represented by an attorney, to the defendant himself or herself. Within thirty days after being notified of the filing of the offer of compromise and prior to the rendering of a verdict by the jury or an award by the court, the defendant or the defendant's attorney may file with the clerk of the court a written acceptance of the offer of compromise agreeing to settle the claim underlying the action for the sum certain specified in the plaintiff's offer of compromise. Upon such filing and the receipt by the plaintiff of such sum certain, the plaintiff shall file a withdrawal of the action with the clerk and the clerk shall record the withdrawal of the action against the defendant accordingly. If the offer of compromise is not accepted within thirty days and prior to the rendering of a verdict by the jury or an award by the court, the offer of compromise

The record reveals the following facts and procedural history. In March, 2000, the city and Klewin entered into a public works contract, known as the CM agreement, whereby Klewin would manage the construction of a sports arena, parking garage and other transportation facilities. The CM agreement set forth a guaranteed maximum price of $44,524,515 for the construction of the arena, which was to be used as a minor league hockey facility and a basketball court for Fairfield University. Thereafter, a dispute arose between the city and Klewin, wherein Klewin claimed entitlement to an increase in the guaranteed maximum price as a result of changes to the arena design.

On June 1, 2001, pursuant to the dispute resolution procedure set forth in § 11.7 of the CM agreement,[6]

shall be considered rejected and not subject to acceptance unless refiled. Any such offer of compromise and any acceptance of the offer of compromise shall be included by the clerk in the record of the case. . . .

"(c) After trial the court shall examine the record to determine whether the plaintiff made an offer of compromise which the defendant failed to accept. If the court ascertains from the record that the plaintiff has recovered an amount equal to or greater than the sum certain specified in the plaintiff's offer of compromise, the court shall add to the amount so recovered eight per cent annual interest on said amount. The interest shall be computed from the date the complaint in the civil action was filed with the court if the offer of compromise was filed not later than eighteen months from the filing of such complaint. If such offer was filed later than eighteen months from the date of filing of the complaint, the interest shall be computed from the date the offer of compromise was filed. The court may award reasonable attorney's fees in an amount not to exceed three hundred fifty dollars, and shall render judgment accordingly. This section shall not be interpreted to abrogate the contractual rights of any party concerning the recovery of attorney's fees in accordance with the provisions of any written contract between the parties to the action."

We recognize that § 52-192a was amended by No. 05-275, § 4, of the 2005 Public Acts, that the amended provisions are applicable only to actions accruing on or after October 1, 2005, and that the action here accrued prior to that date. Because we decline to review Klewin's claim that the trial court improperly failed to grant its request for offer of judgment interest; see part IV of this opinion; however, for purposes of convenience, references to § 52-192a are to the current revision.

[6] Section 11.7 of the CM agreement provides: "Resolution of Disputes and Choice of Law. The parties agree that all disputes between them in connec-

Klewin filed a demand for arbitration with the American Arbitration Association (association), claiming damages resulting from numerous alleged breaches of contract by the city. The city filed an answer to Klewin's subsequently amended demand for arbitration that denied the allegations therein, and also posed two counterclaims for liquidated damages stemming from a delay in the project's completion, and actual damages for other alleged breaches of the contract.

Thirty-seven days of hearings took place before the panel, which initially had consisted of three members, including a construction attorney, a construction professional and a design professional. During the pendency of the hearings, one member of the panel became ill and was unable to complete his service, creating a vacancy on the panel. Over the continued objection of the city, which had desired a panel of three members,

tion with this Agreement or the interpretation thereof, if they cannot be resolved by mutual agreement, shall be mediated before the American Arbitration Association in accordance with its mediation rules then in effect, and if no resolution is achieved, shall be submitted to the American Arbitration Association for resolution in accordance with its commercial rules of arbitration then in effect. Mediation and arbitration shall take place in the City of Bridgeport. If one party requests, the dispute may be determined by the Fast Track or other expedited procedures of the American Arbitration Association then in effect. The award shall be limited to the remedies set forth in this Agreement, the arbitrator shall have authority at his or her option to award reasonable attorneys' fees and costs to the prevailing party, and such award shall be final and binding upon the parties and enforceable in any court of competent jurisdiction. If the award does not contain an award of attorneys' fees and costs, each party shall bear the cost of its respective counsel, and one-half of the administrative costs (except filing fees for demands and counterclaims which shall be borne by the party incurring the same) and arbitrator's fees that arise in connection with the dispute. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS OF THE UNITED STATES AND THE STATE OF CONNECTICUT."

the two remaining arbitrators finished the proceedings.[7] On the twentieth day of the arbitration proceedings, the city attempted to raise a defense that the CM agreement had been procured illegally. The panel determined that the defense was not raised in a timely manner, and the merits of that claim were never presented to the panel. Ultimately, the panel rendered an award of $6,020,231, including interest, in Klewin's favor.[8]

Thereafter, Klewin filed an application to confirm the award in the judicial district of New London at Norwich, and the city filed an application to vacate the award in the judicial district of Fairfield. Both applications were consolidated before the complex litigation docket in the judicial district of Waterbury.[9] In support of its motion to vacate the award, the city claimed that the panel improperly: (1) proceeded with only two arbitrators after the third member became unable to serve due to illness; (2) continued the hearings, despite the fact that it lacked subject matter jurisdiction because the entire CM agreement was void ab initio as a result of corruption surrounding its procurement; (3) rendered an award that violated public policy by enforcing a contract that was obtained in violation of policies prohibiting contingent fee lobbying agreements, as well as the city's own ethics ordinance; and (4) committed misconduct by refusing to consider certain issues or to admit certain evidence.

---

[7] At this time, the city sought an ex parte temporary injunction from the trial court to prohibit the arbitration from proceeding before a panel of only two arbitrators. The trial court, *Sheedy, J.*, denied the application, concluding that it lacked jurisdiction over the matter, which was pending before the panel.

[8] The panel also denied both parties' claims for the payment of attorney's fees, and directed that the parties bear equally the association's administrative fees, as well as the panel's compensation and expenses.

[9] The city also filed in the judicial district of Fairfield at Bridgeport a separate declaratory judgment action challenging the legality of the CM agreement. That declaratory judgment action has been consolidated with the applications to confirm and to vacate the award.

The trial court, *Alander, J.*, rejected all of the city's claims in a thoughtful and comprehensive memorandum of decision. The court first concluded that the parties' agreement and the applicable association rules had authorized the panel to proceed with two, rather than three, arbitrators, after the vacancy arose. The trial court also concluded that the city had waived its objection to the arbitrability of Klewin's claims, and specifically the city's defense that the CM agreement had been obtained illegally, by not raising that issue until the twentieth day of the arbitration proceedings, which was almost two and one-half years after the federal indictment of the city's former mayor, Joseph Ganim, on corruption related charges.[10] The trial court determined that allowing the city to assert its illegality claim in an application to vacate the award would undermine the essential purposes of arbitration and "the fundamental principle which underlies the waiver doctrine of not permitting parties to await a hoped-for favorable decision on the merits, reserving the right to attack should it go against them."[11] The trial court further concluded that the city had waived its claim that the award violated public policy because that claim did not arise from the award itself, but rather from the

[10] The trial court also rejected the city's claims of misconduct by the panel, and noted that the arbitrators, after they initially had refused to hear evidence of the CM agreement's illegality, later offered the city the opportunity to amend the pleadings and to reach this issue, and that the city had declined this opportunity. The trial court also rejected the city's claims that the panel had acted with partiality.

[11] The trial court then rejected the city's arguments that the waiver doctrine was inapplicable because the illegality claims implicated the panel's subject matter jurisdiction, and that the "exclusive jurisdiction to determine the enforceability of the parties' contract lay with a court thereby depriving the arbitrators of subject matter jurisdiction to render any award." In rejecting these claims, the trial court relied on our recent decision in *Nussbaum* v. *Kimberly Timbers, Ltd.*, 271 Conn. 65, 856 A.2d 364 (2004), and emphasized that "courts do not possess exclusive jurisdiction to determine the illegality of contracts containing arbitration provisions" because arbitrators derive their jurisdiction from the agreement of the parties.

waived defense that the underlying contract itself was illegally procured. Accordingly, the court rendered judgment denying the city's application to vacate the award, and granting Klewin's application to confirm the award. The trial court subsequently denied the city's motion for reargument. This appeal and cross appeal followed.

On appeal, the city claims that the trial court improperly: (1) determined that the city had waived its right to claim that the panel lacked subject matter jurisdiction because the CM agreement had been procured illegally, and therefore, was void ab initio; (2) disregarded the panel's conclusion that it lacked subject matter jurisdiction over the city's contract illegality claims, which rendered the award fatally defective because it was not "final or definite"; (3) concluded that the city had waived its right to claim that confirmation of the arbitration award enforcing the illegally procured CM agreement would violate public policy; (4) failed to grant the city's request for an evidentiary hearing with respect to the jurisdictional issues raised in its application to vacate and motion to reargue; and (5) failed to conclude that the panel lacked subject matter jurisdiction because it had consisted of two, rather than the agreed upon three, arbitrators. Additional relevant facts and procedural history will be set forth in the context of each claim on appeal.

I

WHETHER THE COURT OR THE ARBITRATION
PANEL HAD JURISDICTION OVER THE
ISSUES ARISING FROM THE ALLEGED
ILLEGALITY IN THE PROCUREMENT
OF THE CM AGREEMENT

For the sake of clarity, we begin by organizing and summarizing our resolution of the somewhat intermingled nature of the jurisdictional and public policy issues in this case. First, we must consider the nature of the

city's claim that the entire CM agreement was illegally procured, and therefore, void ab initio. Guided by our decision in *Nussbaum* v. *Kimberly Timbers, Ltd.*, 271 Conn. 65, 856 A.2d 364 (2004), and the United States Supreme Court's recent decision in *Buckeye Check Cashing, Inc.* v. *Cardegna*, 546 U.S. 440, 126 S. Ct. 1204, 163 L. Ed. 2d 1038 (2006), we conclude that this claim presents a defense of contract illegality, which is an issue that is firmly committed to the arbitration panel in the first instance. We also conclude that the panel's failure to reach this issue, although improper, does not render the award fatally defective because the city waived its right to pursue that particular claim during the arbitration proceedings.

We next conclude that if a party, either explicitly or implicitly by its conduct, waives the defense of illegality before the arbitration panel, that party is precluded from raising it in subsequent judicial proceedings to confirm or to vacate an arbitration award by characterizing it as a claim that the arbitration award violates public policy. This is because the waiver of that claim before the arbitration panel deprives the reviewing court of the factual predicate for the public policy challenge.

The record reveals the following additional relevant facts and procedural history, which begin with the city's allegations of corruption in the procurement of the CM agreement.[12] Leonard Grimaldi, a close friend and confidant of Ganim was the owner and operator of Harbor Communications, Inc. (Harbor), a public relations consulting business. Grimaldi testified that Ganim had "made it clear" that he expected to be compensated if

---

[12] The city's allegations of corruption in the procurement of the CM agreement are supported by the federal indictment of Ganim, as well as testimony by Paul Pinto and Leonard Grimaldi at both Ganim's criminal trial and in the arbitration proceedings in this case.

any of Grimaldi's clients were to receive work for the city. Klewin was one of Grimaldi's clients.

In February, 1997, Grimaldi entered into a secret written agreement with Paul Pinto, another confidant and fundraiser for Ganim, to do business and share their fees with Ganim. Pinto was an officer, and subsequently majority owner, of The Kasper Group, Inc., an architectural and engineering firm that had been retained by Ganim to do design work for the city, including the arena at issue in this case. The agreement between Grimaldi and Pinto contemplated a contract steering scheme whereby contractors and vendors seeking to do business with the city would hire Harbor as a consulting firm, *without* knowledge of the illegal partnership. Grimaldi then funneled to Pinto nearly $1 million in fees paid to him by the contractors, a sum that Pinto in turn was to share with Ganim. Ganim then would use his office to assure the success of those contractors seeking work with the city, interfering with normal contracting procedures if necessary.

In June, 1999, Grimaldi entered into a written agreement with Klewin for "marketing services" in exchange for a $150,000 payment contingent on the procurement of the arena project contract, with additional payments of $10,000 per month. Klewin ultimately paid Grimaldi $370,000 for " 'services' " in connection with the arena project, and a significant portion of those funds was funneled through Pinto to Ganim. No actual work was ever done for that $370,000.

At a dinner meeting in July, 1999, Ganim told Klewin officials that their company would be selected for the arena project. Shortly thereafter, other city officials told Klewin that the city would proceed with negotiations for the possibility of contracting for the arena services. In January, 2000, Ganim and Klewin signed the CM agreement for a guaranteed maximum price of

$44,524,515 for the arena, with a separate project agreement for an adjacent garage also to be built by Klewin.

The city claims that these activities in the procurement of the CM agreement violated numerous laws, including Bridgeport Ethics Ordinance § 2.38.030,[13]

---

[13] Bridgeport Ethics Ordinance § 2.38.030 provides in relevant part: "A. General Prohibition. No official or employee shall have any interest, financial or otherwise, direct or indirect, or engage in any business employment, transaction or professional activity, or incur any obligation of any nature, which is in substantial conflict with the proper discharge of his duties or employment in the public interest and of his responsibilities as prescribed in the provisions of this chapter.

"B. Specific Conflicts. No official or employee shall:

"1. Solicit or accept any gift, directly or indirectly, whether in the form of money, loan, gratuity, favor, service, thing or promise, or in any other form, under circumstances in which it can reasonably be inferred that the gift is intended to influence him in the performance of his duties or employment in the public interest. Nothing herein shall preclude the solicitation or acceptance of lawful contributions for election campaigns;

"2. Knowingly have or acquire any financial interest or any personal interest, direct or indirect, in any contract or purchase order for any real estate, supplies, materials, equipment or contractual services furnished to, or used by, the city in connection with any project, matter or thing which comes within his jurisdiction or the jurisdiction of the board, commission or committee of which he is a member or the department or agency by which he is employed;

"3. Engage in any business transaction or activity or have a financial interest, direct or indirect, which is incompatible with the proper discharge of his duties or employment in the public interest or which may impair his independence of judgment in the performance of such duties or employment . . . .

"5. Vote upon, or otherwise participate in any transaction, contract or sale with the city or in the sale of real estate, materials, supplies or services to the city or from the city, if he has a personal or financial interest therein . . . .

"C. Contracting. No official or employee or any business with which he is associated shall enter into any contract (other than a contract of employment not otherwise prohibited by, or in conflict with, the provisions of this chapter) or engage in any business transaction or activity with the city, or have a personal or financial interest, direct or indirect, in such transaction, unless the contract has been awarded or the transaction conducted through an open and public process, including prior public offer and public disclosure of all proposals considered and the contract awarded. . . .

"E. Penalties. The failure to comply with, or any violations of, the standards of conduct established by this chapter may upon determination by the proper

which prohibits an employee or official from entering the city into a contract in which he or she has a direct or indirect financial interest. Under the city's reasoning, the CM agreement is, therefore, expressly void ab initio under the terms of the ethics ordinance. See Bridgeport Ethics Ordinance § 2.38.030 (E). Indeed, we also note that, in October, 2001, a federal indictment was issued against Ganim, charging him with racketeering in the procurement of various municipal public works contracts, including the CM agreement.[14]

authority, following proper proceedings and hearings, constitute a cause for disciplinary action or other appropriate penalties. Nothing in this chapter is intended to, or shall deprive any official or employee of all those rights and remedies granted him by any relevant and applicable contract, collective bargaining agreement, ordinance, Charter provision, statute, constitution or other legal authority. *Any and all contracts, agreements, undertakings, commitments, purchases and obligations made, entered into, procured or agreed to in violation of this chapter shall be null and void.*" (Emphasis added.)

[14] The indictment stated, with respect to the federal Racketeering Act 4B; 18 U.S.C. §§ 1341, 1346; that: "Between January 1999 and January 2000, approximately . . . the defendant, JOSEPH P. GANIM, together with Paul J. Pinto and Leonard J. Grimaldi, knowingly devised and participated in a scheme and artifice to defraud and deprive the citizens of Bridgeport of their right to the honest and impartial performance of the official duties of the Mayor, performed . . . deceit, favoritism, bias, conflict of interest and self-enrichment, and to deceive the public, in connection with the awarding of a municipal contract to one of Mr. Grimaldi's clients, C.R. Klewin, relating to the construction of the Arena at Harbor Yard. . . .

"On or about June 21, 1999, Harbor Communications entered into a contract with C.R. Klewin to provide marketing services in connection with C.R. Klewin's efforts to obtain a contract to serve as the construction manager for the Arena at Harbor Yard. Under the terms of the contract, Harbor Communications was to receive a fee in the amount of $150,000 upon the selection of C.R. Klewin as the construction manager for the project. . . .

"It was a part of the scheme and artifice to defraud that, with the knowledge and at the direction of the defendant, JOSEPH P. GANIM, Leonard J. Grimaldi agreed to pay Paul J. Pinto two-thirds of any fees that he received from C.R. Klewin, with the understanding and intent that said payment was in consideration of the defendant, JOSEPH P. GANIM's, support for and approval of the selection of C.R. Klewin as the construction manager for the Arena at Harbor Yard. . . .

"It was further a part of the scheme and artifice to defraud that, on or about September 7, 1999, the defendant JOSEPH P. GANIM, on behalf of the City of Bridgeport, awarded a contract to C.R. Klewin to serve as the construction manager for the Arena at Harbor Yard. . . .

On May 19, 2003, after twenty days of hearings already had been held, the city moved to revise its amended arbitration answer and counterclaim to assert, for the first time, the defense of contract illegality.[15] On May 21, 2003, after considering the jurisdictional implications of

"It was further a part of the scheme and artifice to defraud that, on or about July 29, 1999, C.R. Klewin issued a check to Harbor Communications in the amount of $25,000. On or about August 9, 1999, Harbor Communications issued a check in the amount of $17,667 to Paul J. Pinto, with the understanding and intent that one half of said funds was intended for, and belonged to, the defendant, JOSEPH P. GANIM."

We note that, at Ganim's trial, the jury could not reach a verdict as to whether these acts were proven.

[15] "The courts will not grant relief if the proof of an illegal contract is necessary to support the action or the purpose of the contract is to violate the law." (Internal quotation marks omitted.) *Connecticut Importing Co.* v. *Janowitz*, 128 Conn. 433, 436, 23 A.2d 514 (1941); see also *Tator* v. *Valden*, 124 Conn. 96, 101, 198 A. 169 (1938) ("It is unquestionably the general rule, upheld by the great weight of authority, that no court will lend its assistance in any way toward carrying out the terms of a contract, the inherent purpose of which is to violate the law. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce any alleged right directly springing from such contract . . . ." [Internal quotation marks omitted.]).

We note that illegality in the procurement of a government contract potentially is a very strong defense with harsh results for the contracting party, as contracts not in conformity with mandatory provisions in municipal charters or statutes "[o]rdinarily . . . cannot be ratified, and usually there is no implied liability for the reasonable value of the property or services of which the municipality has had the benefit. These provisions exist to protect the citizens and taxpayers of the municipality from unjust, ill-considered, or extortionate contracts, or those showing favoritism. The reason these contracts are generally not enforced is that if the municipality is allowed to disregard the formalities and the other contracting party is, nevertheless, permitted to recover for the property delivered or the services rendered, either on the ground of ratification, estoppel or implied contract, then it follows that the statute or charter provision can always be evaded." 10 E. McQuillin, The Law of Municipal Corporations (3d Ed. 1999) § 29.02, p. 240; see, e.g., *Manning Engineering, Inc.* v. *Hudson County Park Commission*, 74 N.J. 113, 138, 376 A.2d 1194 (1977) ("damages for breach of an illegal public contract will be denied, regardless of whether it is sought under a contract or quantum meruit theory"); *Christ Gatzonis Electrical Contractor, Inc.* v. *New York City School Construction Authority*, 297 App. Div. 2d 272, 745 N.Y.S.2d 914 (2002) ("[i]t is well established that contracts procured through fraudulent and collusive bidding are void as against public policy, and where work is done pursuant to such illegal municipal contracts, no recovery may be had by the vendor, either on the contract or in quantum

a finding of contract illegality, the panel denied the city's motion to amend its answer, concluding that the proffered amendment was untimely because the indictment of Ganim containing the operative facts had issued in October, 2001, more than one and one-half years earlier. The panel reiterated that position several months later, on October 28, 2003, stating its additional concern that a finding of contract illegality would render the agreement void ab initio, and deprive it of jurisdiction over the dispute.

In November, 2003, the city moved to bifurcate the proceedings and have the illegality issues, which the panel previously had declined to review, considered by a court. The panel denied the city's motion to bifurcate the proceedings, and determined that the issue of contract illegality could be considered, if necessary, during the court proceedings that would follow the arbitration.

meruit, and the municipality can recover from the vendor all amounts paid under such contracts"); see also *Essex* v. *First Union National Bank*, 186 N.J. 46, 58, 891 A.2d 600 (2006) ("[d]isgorgement in favor of the public entity serves as a harsh remedy against those who bribe a public official to secure a public contract and provides a deterrent to such unlawful activity"); *Bozied* v. *Brookings*, 638 N.W.2d 264, 271–72 (S.D. 2001) (contractor seeking to enforce contract to build exhibition hall entered into in violation of bidding statutes may retain funds already paid, but not recover any more, and city was not entitled to refund); 10 E. McQuillin, supra, § 29.26, p. 355 ("[t]he prevailing rule undoubtedly is that if the powers of a municipality or its agents are subjected by statute or charter to restrictions as to the form and method of contracting which limit the power itself, the corporation cannot be held liable by either an express or an implied contract in defiance of such restrictions"); but see *Vertex, Inc.* v. *Waterbury*, 278 Conn. 557, 577 and n.14, 898 A.2d 178 (2006) (Noting that a claim for unjust enrichment may be made against a municipality, but that a "plaintiff's ability to prevail on its unjust enrichment claim nevertheless may be limited, even if it was within the municipality's powers to contract for the services that the plaintiff conferred upon it. As we have stated repeatedly, the trier of fact must examine the particular circumstances and the conduct of the parties to determine if the defendant was unjustly enriched to the plaintiff's detriment."); 10 E. McQuillin, supra, § 29.02, p. 240 (discussing minority rule as "based on the idea that it is unjust for a municipality to receive and accept the benefits of a contract and then defend an action to recover the contract price or the reasonable value, on the ground that the contract was not entered into as provided by statute or the charter").

Shortly thereafter, the chairman of the panel broached the possibility of, if both parties agreed, considering the contract illegality issue at that point, notwithstanding the panel's prior jurisdictional rulings to the contrary. The panel and counsel then engaged in off-the-record discussions, and the issue was not pursued further before the panel, although the panel left that option open for the duration of the proceedings. When the panel subsequently issued the award in this case, it ruled that "the issues concerning the illegality of the contract because of alleged [Connecticut Unfair Trade Practices Act] violations and other illegal acts as stated in [the city's] [c]ounterclaim and [a]ffirmative [d]efenses would not be considered by the [p]anel because [the city's] pleading was: (a) filed too late, being twenty months after the date of . . . Ganim's indictment when facts to support this argument were known, or should have been known by [the city]; and that (b) to give credence to [the city's] argument that the [c]ontract was void ab initio would deprive the [p]anel of its jurisdiction." Thereafter, during the confirmation proceedings, the trial court concluded that the panel had jurisdiction in the first instance over the contract illegality claim, but that the city had waived that claim by its conduct during the arbitration proceedings.

A

Whether the Legality of a Contract Containing an
Arbitration Clause Is To Be Decided by an
Arbitrator or by the Trial Court in
the First Instance

The city first contends that a claim that a contract containing an arbitration clause is void ab initio on the ground of illegality falls within the exclusive jurisdiction of the court, and not the arbitration panel. In support of that proposition, the city argues that a declaration

that a contract is void ab initio logically would render void an arbitration clause contained in that contract, thereby depriving the panel of subject matter jurisdiction over the dispute and the trial court of jurisdiction to confirm any resulting award. Klewin, relying on the United States Supreme Court's recent decision in *Buckeye Check Cashing, Inc.* v. *Cardegna*, supra, 546 U.S. 440, and this court's decision in *Nussbaum* v. *Kimberly Timbers, Ltd.*, supra, 271 Conn. 65, contends in response that the issue of contract illegality is one that is committed to the panel in the first instance. We agree with Klewin, and conclude that, in the absence of an attack specifically on the validity of the arbitration clause, which is an issue for the court, the issue of the legality of the entire underlying contract lies solely and squarely within the purview of the panel.

We note at the outset that the city's claim in the present case, which concerns the intersecting subject matter jurisdiction of the panel and the court sitting in a confirmation proceeding, presents a question of law. Our review of the trial court's decision in this case is, therefore, plenary. See, e.g., *Alexson* v. *Foss*, 276 Conn. 599, 604, 887 A.2d 872 (2006).

This court most recently addressed an arbitration clause in a purportedly illegal contract in *Nussbaum* v. *Kimberly Timbers, Ltd.*, supra, 271 Conn. 68, which involved a dispute under a new home construction contract that contained an arbitration clause. The plaintiffs applied for an order to stay the arbitration proceedings and an order to show cause on the ground that the contract was void under General Statutes § 20-417d of the New Home Construction Contractors Act; General Statutes § 20-417a et seq.; because the defendant was unlicensed at the time he had entered the contract and the contract failed to comply with certain statutory notice requirements. *Nussbaum* v. *Kimberly Timbers, Ltd.*, supra, 67–68. We concluded that the "claim that

the contract is unenforceable is within the scope of the arbitration clause and must be decided initially by the arbitrator." Id., 75. We determined that the "claim that the contract is unenforceable because of the defendant's alleged failure to comply with § 20-417d clearly is a claim 'arising out of or relating to' the contract," and is "therefore, arbitrable." Id., 74. We noted that "the arbitration clause is in writing, as required under [General Statutes] § 52-408,[16] and the *plaintiffs do not allege that the agreement to arbitrate is void* for reasons that involve the formation of that agreement, such as duress, misrepresentation, fraud or undue influence. . . . Finally, the plaintiffs do not make a claim of any improprieties in the formation of the underlying contract that would render the arbitration agreement void." (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 74–75. We also relied on the severability principle discussed in *Success Centers, Inc.* v. *Huntington Learning Centers, Inc.*, 223 Conn. 761, 772, 613 A.2d 1320 (1992), namely, that an "arbitration provision in an agreement is, in effect, a separate and distinct agreement." (Internal quotation marks omitted.) See *Nussbaum* v. *Kimberly Timbers, Ltd.*, supra, 77. We, therefore, concluded "that the plaintiffs' claim that the contract is unenforceable is within the scope of the

---

[16] General Statutes § 52-408 provides: "An agreement in any written contract, or in a separate writing executed by the parties to any written contract, to settle by arbitration any controversy thereafter arising out of such contract, or out of the failure or refusal to perform the whole or any part thereof, or a written provision in the articles of association or bylaws of an association or corporation of which both parties are members to arbitrate any controversy which may arise between them in the future, or an agreement in writing between two or more persons to submit to arbitration any controversy existing between them at the time of the agreement to submit, or an agreement in writing between the parties to a marriage to submit to arbitration any controversy between them with respect to the dissolution of their marriage, except issues related to child support, visitation and custody, shall be valid, irrevocable and enforceable, except when there exists sufficient cause at law or in equity for the avoidance of written contracts generally."

arbitration clause and must be decided initially by the arbitrator."[17] Id., 75.

In *Nussbaum*, we noted that "§ 52-408 is similar to § 2 of the Federal Arbitration Act, 9 U.S.C. § 1 et seq. Section 2 of that act provides that written arbitration agreements shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. 9 U.S.C. § 2 (2000). In construing a Connecticut statute that is similar to federal law, we are guided by federal case law. . . . Thus, when there is no Connecticut case law directly on point, we may turn for guidance to the applicable federal law." (Citations omitted; internal quotation marks omitted.) *Nussbaum* v. *Kimberly Timbers, Ltd.*, supra, 271 Conn. 73 n.6.

Accordingly, our embrace of the persuasive value of federal arbitration law renders *Buckeye Check Cashing, Inc.* v. *Cardegna,* supra, 546 U.S. 440, wherein the United States Supreme Court decided the issue of "whether a court or an arbitrator should consider the claim that a contract containing an arbitration provision is void for illegality," especially relevant to our disposition of the present case. Id., 442. In *Buckeye Check Cashing, Inc.*, two individuals had entered into agreements with a check cashing business wherein "they received cash in exchange for a personal check in the amount of the cash plus a finance charge." Id. Each separate transaction included a broad arbitration clause governed by Florida substantive law and the Federal Arbitration Act. Id. The customers brought a "putative class action in Florida state court, alleging that [the check cashing business] charged usurious interest rates and that the [a]greement violated various

---

[17] Indeed, we also noted that "courts routinely consider public policy claims after they have been decided by arbitrators." *Nussbaum* v. *Kimberly Timbers, Ltd.*, supra, 271 Conn. 75 n.7.

Florida lending and consumer-protection laws, rendering it criminal on its face." Id., 443. The Florida Supreme Court had concluded that a court, rather than an arbitrator, should decide the issue of a contract's legality because "to enforce an agreement to arbitrate in a contract challenged as unlawful could breathe life into a contract that not only violates state law, but also is criminal in nature . . . ." (Internal quotation marks omitted.) Id.

On appeal, the United States Supreme Court reversed the judgment of the Florida Supreme Court. The court noted that § 2 of the Federal Arbitration Act "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts"; id.; and also that "[c]hallenges to the validity of arbitration agreements 'upon such grounds as exist at law or in equity for the revocation of any contract' can be divided into two types. One type challenges specifically the validity of the agreement to arbitrate. . . . The other challenges the contract as a whole, either on a ground that directly affects the entire agreement (e.g., the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." (Citation omitted.) Id., 444.

The Supreme Court concluded that the customers' claim was "of this second type . . . [because] [t]he crux of the complaint is that the contract as a whole (including its arbitration provision) is rendered invalid by the usurious finance charge." Id. The Supreme Court relied on its previous decision in *Prima Paint Corp.* v. *Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–404, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967), in which the court had held, that "if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the making of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory

language does not permit the federal court to consider claims of fraud in the inducement of the contract generally." (Internal quotation marks omitted.) See *Buckeye Check Cashing, Inc.* v. *Cardegna*, supra, 546 U.S. 445. The court noted that its decision in *Prima Paint Corp.* "rejected the view that the question of 'severability' was one of state law, so that if state law held the arbitration provision not to be severable a challenge to the contract as a whole would be decided by the court." Id.

The Supreme Court stated that "*Prima Paint [Corp.]* and *Southland [Corp.* v. *Keating*, 465 U.S. 1, 104 S. Ct. 852, 79 L. Ed. 2d 1 (1984)][18] answer the question presented here by establishing three propositions. First, as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract. Second, unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance. Third, this arbitration law applies in state as well as federal courts." *Buckeye Check Cashing, Inc.* v. *Cardegna*, supra, 546 U.S. 445–46. Applying those holdings, the court concluded that, "because respondents challenge the [a]greement, *but not specifically its arbitration provisions*, those provisions are enforceable apart from the remainder of the contract. The challenge should therefore be considered by an arbitrator, not a court." (Emphasis added.) Id., 446; see also id., 449 ("[w]e reaffirm today that, regardless of whether the challenge is brought in federal or state court, a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the

---

[18] In *Southland Corp.* v. *Keating,* supra, 465 U.S. 10, the Supreme Court concluded that the Federal Arbitration Act preempted a state franchising statute that the California Supreme Court had interpreted as requiring "judicial consideration of claims brought under the state statute and accordingly refused to enforce the parties' contract to arbitrate such claims. So interpreted the California Franchise Investment Law directly conflicts with § 2 of the Federal Arbitration Act and violates the Supremacy Clause."

arbitrator"). The Supreme Court stated that the Florida court improperly had "relied on the distinction between void and voidable contracts" in declining to apply the severability rule of *Prima Paint Corp.* because that case "rejected application of state severability rules to the arbitration agreement *without discussing* whether the challenge at issue would have rendered the contract void or voidable."[19] (Emphasis in original.) Id., 446.

Given the similarity of § 52-408 to § 2 of the Federal Arbitration Act, we adopt the *Prima Paint Corp.* rule as applied in *Buckeye Check Cashing, Inc.*, as a matter of state arbitration law.[20] Although we find somewhat

---

[19] The Supreme Court further noted that § 2 of the Federal Arbitration Act "renders 'valid, irrevocable, and enforceable' 'a written provision in' or 'an agreement in writing to submit to arbitration an existing controversy arising out of' a 'contract.' Since, [the] respondents argue, the only arbitration agreements to which § 2 applies are those involving a 'contract,' and since an agreement void ab initio under state law is not a 'contract,' there is no 'written provision' in or 'controversy arising out of' a 'contract,' to which § 2 can apply. This argument echoes Justice Black's dissent in *Prima Paint* [*Corp.*]: 'Sections 2 and 3 of the [a]ct assume the existence of a valid contract. They merely provide for enforcement where such a valid contract exists.' . . . We do not read 'contract' so narrowly. The word appears four times in § 2. Its last appearance is in the final clause, which allows a challenge to an arbitration provision 'upon such grounds as exist at law or in equity for the revocation of any contract.' . . . There can be no doubt that 'contract' as used this last time must include contracts that later prove to be void. Otherwise, the grounds for revocation would be limited to those that rendered a contract voidable—which would mean (implausibly) that an arbitration agreement could be challenged as voidable but not as void. Because the sentence's final use of 'contract' so obviously includes putative contracts, we will not read the same word earlier in the same sentence to have a more narrow meaning. We note that neither *Prima Paint* [*Corp.*] nor *Southland* [*Corp.*] lends support to [the] respondents' reading; as we have discussed, neither case turned on whether the challenge at issue would render the contract voidable or void." (Citation omitted.) *Buckeye Check Cashing, Inc.* v. *Cardegna*, supra, 546 U.S. 447–48.

[20] We agree with the city that, as recognized by the trial court, this case is governed by state, and not federal, arbitration law. Accordingly, the city argues that *Buckeye Check Cashing, Inc.*, is not necessarily dispositive of the present case. We agree, but emphasize that we adopt the central holding of *Buckeye Check Cashing, Inc.*, as a matter of *state* law.

troubling the "chicken or the egg" scenario embodied by the present case, namely, that requiring arbitration in this context conceivably might give partial effect to a contract that subsequently will be determined to be void, we agree with the United States Supreme Court's resolution of this particular issue. "It is true . . . that the *Prima Paint* [*Corp.*] rule permits a court to enforce an arbitration agreement in a contract that the arbitrator later finds to be void. *But it is equally true that* [*the*] *respondents' approach permits a court to deny effect to an arbitration provision in a contract that the court later finds to be perfectly enforceable. Prima Paint* [*Corp.*] resolved this conundrum—and resolved it in favor of the separate enforceability of arbitration provisions." (Emphasis added.) Id., 448–49.

We also find instructive the Montana Supreme Court's application of *Buckeye Check Cashing, Inc.*, in *Martz* v. *Beneficial Montana, Inc.*, 332 Mont. 93, 135 P.3d 790 (2006). In that case, the plaintiffs claimed that a secured consumer loan agreement, which contained an arbitration clause, was void ab initio under Montana's consumer loan and unfair trade practices acts. Id., 95. The Montana Supreme Court relied on *Buckeye Check Cashing, Inc.*, and concluded that the trial court properly had granted the defendant's motion to compel arbitration. Id., 96–98. The court rejected the plaintiffs' argument that, "even where contracts contain arbitration provisions, challenges to the contract as a whole must be heard by courts, since void contracts would necessarily invalidate any included arbitration provisions." Id., 96. The court noted that the plaintiffs' challenge was to the contract as a whole, and not just to the arbitration clause. Id., 98. Thus, the Montana Supreme Court concluded that claims that a contract is void ab initio as a "whole are properly decided via arbitration, given the existence of an arbitration clause." Id., 99. Compare *Nagrampa* v. *Mailcoups, Inc.*, 469 F.3d 1257,

1271 (9th Cir. 2006) (breach of contract complaint containing attacks on validity of arbitration clause was properly before court and not arbitrator when allegations of contractual unenforceability were limited to arbitration clause because "[w]here, as here, no claim threatens to invalidate or otherwise directly affect the entire contract, the federal court must decide claims attacking the validity of the arbitration provision, even if substantive state law requires an examination of the making of the entire contract as part of that analysis") with *Brown* v. *Pacific Life Ins. Co.*, 462 F.3d 384, 397 (5th Cir. 2006) (Declining to address claims that "fraud and error" vitiated a contract containing an arbitration clause because the plaintiff investors did "not distinguish between their attacks on the validity of the client agreements and the arbitration clauses themselves. They assert only that they would not have entered into the client agreements containing the arbitration clauses if [the investment broker] had not misrepresented the terms of their investments."). Accordingly, we conclude that the city's proffered defense of contract illegality based on ethical and statutory violations attendant to the formation of the CM agreement is one committed to the jurisdiction of the panel in the first instance.

We address briefly the city's reliance on *Buckeye Check Cashing, Inc.* v. *Cardegna*, supra, 546 U.S. 444 n.1, wherein the Supreme Court stated: "The issue of the contract's validity is different from the issue of whether any agreement between the alleged obligor and obligee was ever concluded. Our opinion today *addresses only the former, and does not speak to the issue decided in the cases cited by [the] respondents* (and by the Florida Supreme Court), which hold that it is for courts to decide whether the alleged obligor ever signed the contract . . . whether the signor lacked authority to commit the alleged principal . . . and whether the signor lacked the mental capacity to

assent . . . ."[21] (Citations omitted.) In relying on this footnote, the city emphasizes its ethics ordinance, which prohibits an employee or official from entering into a contract in which he or she has a direct or indirect financial interest, and expressly voids such contracts.

---

[21] In *Buckeye Check Cashing, Inc.* v. *Cardegna,* supra, 546 U.S. 444 n.1, the Supreme Court cited cases on one side of a Circuit Court of Appeals split about whether an arbitrator or a court decides a challenge to a contract based on the party's capacity to assent to the contract, or whether the contract was ever actually signed. See id., citing *Spahr* v. *Secco,* 330 F.3d 1266, 1273 (10th Cir. 2003) (Concluding that the *Prima Paint* [*Corp.*] rule did not apply to mental capacity challenges because "it would be odd indeed if a party claimed that its mental incapacity specifically affected the agreement to arbitrate. . . . Unlike a claim of fraud in the inducement, which can be directed at individual provisions in a contract, a mental capacity challenge can logically be directed only at the entire contract."); *Sandvik AB* v. *Advent International Corp.,* 220 F.3d 99, 107 (3d Cir. 2000) (whether signer had authority to sign contract for corporation to be decided by court because *Prima Paint Corp.* "did not consider a situation in which the existence of the underlying contract was at issue," so "we draw a distinction between contracts that are asserted to be void or non-existent, as is contended here, and those that are merely voidable, as was the contract at issue in *Prima Paint* [*Corp.*]" [internal quotation marks omitted]); but see *Primerica Life Ins. Co.* v. *Brown,* 304 F.3d 469, 472 (5th Cir. 2002) ("[The defendant borrower's] capacity defense is a defense to his entire agreement with [the plaintiff lender] and not a specific challenge to the arbitration clause. Therefore, [the defendant's] capacity defense is part of the underlying dispute between the parties which, in light of *Prima Paint* [*Corp.*] and its progeny, must be submitted to the arbitrator.").

We note that our research indicates that, in the wake of *Buckeye Check Cashing, Inc.,* other state courts have concluded that the trial court must decide in the first instance claims with respect to whether the parties actually had agreed to the contract containing the arbitration clause. See *Rowe Enterprises, LLC* v. *International Systems & Electronics Corp.,* 932 So. 2d 537, 538–41 (Fla. App. 2006) (trial court required to hold hearing on defendant's motion to compel arbitration when plaintiff's principal claimed that he had never seen document containing arbitration clause, and that his signature on that document had been forged), review denied, 2006 Fla. LEXIS 2629 (October 26, 2006); *Rhymer* v. *21st Mortgage Corp.,* 2006 Tenn. App. LEXIS 800, *9–10 (December 19, 2006) (trial court required to decide mental capacity challenge and either void contract or compel arbitration based on result of that hearing as federal courts "have generally reasoned that there is a difference between challenging a contract on the basis of a party's status [i.e. mental incapacity] and challenging a contract based on behavior/conduct of a party [i.e. fraudulent inducement]").

See Bridgeport Ethics Ordinance § 2.38.030; see also footnote 13 of this opinion. The city claims that, because of his violation of the ethics ordinance, Ganim had no authority to assent to the CM agreement, thereby taking this case outside the scope of the rule of *Buckeye Check Cashing, Inc.*, and *Prima Paint Corp.*

We find footnote 1 of *Buckeye Check Cashing, Inc.*, far from conclusive in the present case, because it does not state an exception to the primary rule of *Buckeye Check Cashing, Inc.*; instead, it merely states that the Supreme Court did not need to reach the issue posed by cases that involve capacity or assent, as compared to substantive illegality. Moreover, the analysis in *Buckeye Check Cashing, Inc.*, which emphasizes an inquiry into whether the challenge is to the arbitration clause, rather than the entire contract, renders the cases cited in footnote 1 of little value in the present case, particularly to the extent that they focus on the void/voidable distinction, an approach *specifically rejected* by the Supreme Court. See *Buckeye Check Cashing, Inc.* v. *Cardegna,* supra, 546 U.S. 447–48; see also footnote 19 of this opinion.

Indeed, the city's claims in this case focus on the fact that the CM agreement was unenforceable because it had been procured illegally. Thus, the city's protestations notwithstanding, this case does not present the near Kafkaesque problem envisioned in *Sphere Drake Ins. Ltd.* v. *All American Ins. Co.,* 256 F.3d 587, 590 (7th Cir. 2001), wherein the court stated that whether a reinsurance broker had exceeded its authority in committing an insurance company to an insurance contract that contained an arbitration clause, a defense that would render the contract void, is for the court and not the arbitrator. The Seventh Circuit Court of Appeals rejected the applicability of *Prima Paint Corp.,* noting that "whether there was any agreement is a distinct question . . . [because whether] a person whose name

was written on a contract by a faithless agent who lacked authority to make that commitment [does not create] a defense to enforcement, as in *Prima Paint* [*Corp.*]; it is a situation in which no contract came into being; and as arbitration depends on a valid contract an argument that the contract does not exist can't logically be resolved by the arbitrator (unless the parties agree to arbitrate this issue after the dispute arises). It was possible to arbitrate in *Prima Paint* [*Corp.*] without circularity; in forgery and agency cases, by contrast, the arbitrator's authority to resolve the dispute would depend on one particular answer to that very dispute. Only a court can break that circle."[22] Id., 590–91.

In our view, the present case falls into the gray area between a case involving a contract that is void, or nonexistent, because it is substantively unenforceable, such as that contemplated in *Buckeye Check Cashing, Inc.*, or *Martz* v. *Beneficial Montana, Inc.*, supra, 332 Mont. 93, and a contract that is void, or nonexistent, because of lack of assent or capacity. See, e.g., *Sphere Drake Ins. Ltd.* v. *All American Ins. Co.*, supra, 256 F.3d 590–91. The nature of the illegal contract defense, however, as found in our case law; see footnote 15 of this opinion; puts this case solidly toward the enforceability side of that spectrum, rather than in the realm of the question of whether such a contract to arbitrate even exists.[23] Thus, because the city does not claim only

---

[22] The Seventh Circuit Court of Appeals further concluded that "a person who has not consented (or authorized an agent to do so on his behalf) can't be packed off to a private forum. Courts have jurisdiction to determine their jurisdiction not only out of necessity (how else would jurisdictional disputes be resolved?) but also because their authority depends on statutes rather than the parties' permission. Arbitrators lack a comparable authority to determine their own authority because there is a non-circular alternative (the judiciary) and because the parties do control the existence and limits of an arbitrator's power. No contract, no power." *Sphere Drake Ins. Ltd.* v. *All American Ins. Co.*, supra, 256 F.3d 591.

[23] Accordingly, we disagree with the city's reliance on the Appellate Court decision in *Total Property Services of New England, Inc.* v. *Q.S.C.V., Inc.*, 30 Conn. App. 580, 621 A.2d 316 (1993). In that case, the Appellate Court

that this particular arbitration clause was the result of a corrupt mayor's chicanery and prostitution of his office, but rather, attacks the validity of the entire contract, we conclude that the issue of the legality of the CM agreement is committed to the province of the arbitration panel, and not the court.[24]

concluded that when the trial court confirmed an arbitration award, it improperly failed to hold a hearing about whether the defendant real estate partnership in the arbitration, or its agent, had signed the contract containing the arbitration clause. Id., 586–88. *Total Property Services of New England, Inc.*, is further distinguishable from the present case because the defendant partnership therein did not participate in the arbitration proceedings at all and claimed that it had not received proper notice of those proceedings. Id., 583, 593–94.

[24] As in *Nussbaum* v. *Kimberly Timbers, Ltd.*, supra, 271 Conn. 77, we also find misplaced the city's reliance on *International Brotherhood of Teamsters* v. *Shapiro*, 138 Conn. 57, 60, 65, 82 A.2d 345 (1951), in which this court concluded that a company was entitled to a judicial determination of whether it was under duress when it had entered into a collective bargaining agreement that contained an arbitration clause. This court concluded that, although the company had declined to participate in the arbitration proceedings at issue, the union was not obliged to move to compel arbitration and properly had presented its case to the arbitrators, and also that the company had not been deprived of its right to a judicial determination of the contract's validity. Id., 63–65. Noting, "parenthetically, that [when] the [arbitration] board undertook to pass upon this question . . . it went beyond its authority"; id., 63; the court nevertheless determined that the company's right to a judicial determination of the validity of the agreement had not been violated because, "[u]ntil an adjudication is had, an award by arbitrators appointed under a contract executed through duress may be challenged whenever it is relied upon as a source of rights and duties. . . . Indeed, this is exactly what the company did. It filed a defense raising the question of the validity of the contract and, by counterclaim, it sought to vacate the awards. *That the court passed upon the issue of duress after, instead of before, the board determined the two submissions affords the company no valid reason to complain.*" (Citation omitted; emphasis added.) Id., 65. The court also stated, however, that "in a situation like that at bar, orderly procedure will better be served by first disposing of legal questions addressed to the authority of an arbitrator to act. The company's challenge of the board's power to act was *in effect a jurisdictional problem* which ordinarily should be resolved before a hearing on the merits of a submission is had." (Emphasis added.) Id., 65–66.

Our decision in *International Brotherhood of Teamsters* does not control the present case because that decision predates by nearly twenty years the recognition of the rule of arbitration clause severability by both this court

## B

## Whether the City Waived Its Defense
## of Contract Illegality

The city next claims that, because the arbitration panel lacked subject matter jurisdiction to decide whether a contract is void ab initio, that claim is not subject to waiver. In part I A of this opinion, we concluded that the city's claim that the CM agreement was void ab initio on the grounds of illegality is squarely within the jurisdiction of the panel, and not the court. Accordingly, we next consider whether the trial court properly concluded that the city, by its conduct during the arbitration proceedings, waived that contract defense.

The record reveals the following additional facts and procedural history. As noted previously, on May 19, 2003, after twenty hearing days had already been held, the city moved to revise its amended answer and counterclaim to assert the defense of contract illegality. On May 21, 2003, after considering the jurisdictional implications of a finding of contract illegality, the panel denied the city's motion to amend the pleadings to reflect illegal procurement of the contract, noting that the indictment of Ganim containing the operative facts had been issued in October, 2001; see footnote 14 of this opinion; and that it was "too late in the game to make that counterclaim [because] the facts that underlie that counterclaim were known, or should have been

and the United States Supreme Court. See *Prima Paint Corp.* v. *Flood & Conklin Mfg. Co.*, supra, 388 U.S. 403–404; *Nussbaum* v. *Kimberly Timbers, Ltd.*, supra, 271 Conn. 78. Moreover, in light of the Supreme Court's analytical emphasis in *Buckeye Check Cashing, Inc.* v. *Cardegna*, supra, 546 U.S. 440, on attacks on the entire contract, as opposed to challenges solely to the arbitration clause, that legal development has rendered somewhat outmoded this court's analysis of the duress defense in *International Brotherhood of Teamsters*, which focused on the entire collective bargaining agreement and not just the arbitration clause.

known, by the city . . . as of the date of the stated indictment against Ganim, and I guess his two, for lack of a better word, cohorts or henchmen." Indeed, in considering proffered evidence on similar claims several months later, on October 28, 2003, the panel reiterated that it was "deciding this case as a construction claim and a construction counterclaim and to the extent any evidence can come out showing that the change orders were, let's say, unwarranted in initiation or unwarranted payment, that's one thing.

"But we are not going to try this issue as to illegal contracts which we consider, if permitted, would be void ab initio and therefore, we would have no jurisdiction if the entire contract with Klewin were to be found illegal.

"And furthermore, this claim has arisen much too late in the process as far as the illegality of the [CM agreement]. It should come as no surprise to anybody around here in [the city] that [Ganim] was indicted a particular count or counts—excuse me—relative to the letting of the arena contract. That information was available long before this panel ever began to sit."

Subsequently, in November, 2003, the panel considered the city's motion to bifurcate the proceedings and to have the illegality issues, which it had declined to review, considered by the court.[25] The panel denied the city's motion, and again reiterated that the basis of its decision was the timing of the allegations, and that the city should have raised the issue at the outset of the arbitration proceedings or filed court proceedings to stop the arbitration. The panel also took the position that the issue of contract illegality could be considered,

---

[25] By October, 2003, Ganim's criminal trial had ended and the city had the opportunity to conduct prison depositions of Pinto and Grimaldi. See also footnote 12 of this opinion.

if necessary, during the judicial proceedings to follow the arbitration process.

Shortly thereafter, the chairman of the panel raised the possibility of, with the consent of the parties, considering the illegality issue at that point, notwithstanding the panel's prior jurisdictional rulings to the contrary. The panel and counsel then engaged in off-the-record discussions, and subsequently went back on the record, with the chairman noting that "the panel and the counsel for both parties [have] had an opportunity to discuss privately a proposition of the panel that, contrary to its previous ruling on the lack of jurisdiction of subject matter and the lateness of filing the amended complaint or the amended counterclaim regarding the illegality of the entire contract, the panel had suggested to the parties that if they could agree in writing in a form that we would all have had some input on, that they—the parties were giving the panel the subject matter jurisdiction over the illegality of the entire contract issue and would waive the lateness in filing for an amendment in the hopes that this would, let's say, do away with a possible legal issue down the road.

"The parties talked about that and with their counsel, and one of the parties does not want to do that for its own reasons. So, we will continue with the hearings. We will issue a ruling on the bifurcation issue.

"And we've told the parties in an interest to resolve the dispute that if there is a change of mind by the reluctant party that it wants to proceed as we had suggested, we will get something in writing and so proceed." Klewin then asked the panel to identify which party was willing to proceed, and which party was not. The city objected to this request as "unfair," and the panel's chairman overruled the objection and denied the city's motion to strike Klewin's comment, despite the fact that, "[t]he panel was very particular in not

naming the party because it thought that it would be unfair. There are many reasons for not assenting to what the panel suggested." The panel did, however, leave the option available for the parties for the duration of the proceedings.

When acting on the consolidated proceedings to vacate or to confirm the arbitration award, the trial court concluded that the city waived its right to claim that the dispute was not arbitrable because of its conduct in the proceedings. The trial court specifically credited the panel's emphasis on the fact that the city did not seek to amend its pleadings to raise its illegality claim until after twenty days of hearings had already been held, which was more than two and one-half years after the arbitration had commenced. The trial court noted that the panel had denied the city permission to amend its answer to assert an illegality defense because it deemed the amendment untimely, as the city had had notice of the alleged illegal conduct since October, 2001, when Ganim was indicted in federal court. Indeed, the trial court emphasized that the city had taken no action to contest the arbitrability of the dispute at that point by either filing an objection in the arbitration, filing an action for a declaratory judgment, or refusing to participate further in the arbitration, thus requiring Klewin to file a motion to compel pursuant to General Statutes § 52-410. Ultimately, the trial court concluded that the city's actions amounted to seeking "two bites at the apple."

We note briefly the proper standard of review. Ordinarily, "[w]aiver is a question of fact" subject to the clearly erroneous standard of review. *AFSCME, Council 4, Local 704* v. *Dept. of Public Health*, 272 Conn. 617, 622, 866 A.2d 582 (2005); id., 624–25 (applying clearly erroneous standard of review to case wherein evidence consisted of letter by plaintiff waiving deadline for arbitration decision). We agree with the city, however, that

plenary review is appropriate in the present case because "when a trial court makes a decision based on pleadings and other documents, rather than on the live testimony of witnesses, we review its conclusions as questions of law." *State* v. *Lewis*, 273 Conn. 509, 516–17, 871 A.2d 986 (2005).

"Waiver is the intentional relinquishment or abandonment of a known right or privilege." (Internal quotation marks omitted.) *AFSCME, Council 4, Local 704* v. *Dept. of Public Health*, supra, 272 Conn. 623. "[V]arious statutory and contract rights may be waived." (Internal quotation marks omitted.) Id. "Waiver is based upon a species of the principle of estoppel and where applicable it will be enforced as the estoppel would be enforced. . . . Estoppel has its roots in equity and stems from the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed . . . . Waiver does not have to be express, but may consist of acts or conduct from which waiver may be implied. . . . In other words, waiver may be inferred from the circumstances if it is reasonable to do so." (Citations omitted; internal quotation marks omitted.) Id. The waiver doctrine applies to arbitration because "[w]e have made it clear that we will not permit parties to anticipate a favorable decision, reserving a right to impeach it or set it aside if it happens to be against them, for a cause which was well known to them before or during the trial." (Internal quotation marks omitted.) *Diamond Fertiliser & Chemical Corp.* v. *Commodities Trading International Corp.*, 211 Conn. 541, 553, 560 A.2d 419 (1989), quoting *Krattenstein* v. *G. Fox & Co.*, 155 Conn. 609, 616, 236 A.2d 466 (1967).

In *New Haven* v. *Local 884, Council 4, AFSCME, AFL-CIO*, 237 Conn. 378, 380, 677 A.2d 1350 (1996), we concluded that a city that was party to a labor grievance

arbitration proceeding had waived its right to vacate the award because of its affirmative conduct during the proceeding. The city sought to vacate the arbitration award on the ground that the state mediation and arbitration board had committed misconduct by refusing to grant the city's attorney a continuance when he became ill during the proceedings. Id., 381. We concluded that the trial court did not commit clear error when it determined that the city implicitly had waived its claim that the arbitrator committed misconduct because its attorney had continued to negotiate "freely and voluntarily" after the denial of the continuance. Id., 389–90. Similarly, in *AFSCME, Council 4, Local 704* v. *Dept. of Public Health,* supra, 272 Conn. 626, we concluded that "the Appellate Court improperly concluded that the plaintiff's unilateral grant of the arbitrator's request for an extension was ineffective in the absence of the defendant's consent, and therefore could not amount to a waiver of the plaintiff's right to challenge the untimeliness of the award." See also *White* v. *Kampner,* 229 Conn. 465, 478, 641 A.2d 1381 (1994) (The defendant objected to the arbitrability of the dispute based on the parties' failure to satisfy the preconditional mandatory negotiation clause at issue, but "[b]ecause the defendants preserved their objection to the arbitration, they had the option of committing the issue to the arbitrator without risking any waiver of their right to have the issue ultimately determined by the trial court. . . . Under these circumstances, we hold that the defendants did not waive consideration of the issue of arbitrability by the trial court." [Citation omitted.]); *Diamond Fertiliser & Chemical Corp.* v. *Commodities Trading International Corp.,* supra, 211 Conn. 552–53 ("the plaintiff could not prevail in its attempt to vacate the award as untimely because it waived any right to object to the timeliness of the award by failing to object when it was notified of the date on

which the award would be rendered"); cf. *Nagrampa* v. *Mailcoups, Inc.*, supra, 469 F.3d 1278 (concluding that plaintiff did not waive her objection to arbitration via participation when her participation therein was limited to two preliminary telephone conferences and steps necessary to preserve her objections to arbitration and rights in proceeding, including filing of counter-claim and discovery requests, when she "never partici-pated in any proceedings which even touched the merits of the contractual claims that were to be the subject of arbitration").[26]

It is apparent to us that the city acted aggressively, and, indeed, properly; see part I A of this opinion; in attempting to present its contract illegality claim to the panel. We agree with the trial court's determination, however, that the city's attempt was, in essence, too little, too late. Our conclusion that the city waived its contract illegality claim is based on the findings by the panel and the trial court that the city unduly delayed the presentation of the claim, notwithstanding the fact that it was aware of the bases for the claim since Octo-ber, 2001, when the federal indictment against Ganim was issued.[27] Indeed, the city did nothing *at that point*

---

[26] The Ninth Circuit Court of Appeals noted by contrast that it had found waivers by conduct of objections to arbitration in cases wherein parties raised arbitrability challenges after losing in proceedings wherein they had, for example, presented evidence or submitted extensive merits briefs. See *Nagrampa* v. *Mailcoups, Inc.*, supra, 469 F.3d 1279.

[27] The city argues in its brief, and emphasized at oral argument before this court, that evidence of illegality was not available until midway through the arbitration process because of concealment by Klewin and the pending federal criminal proceedings. Similarly, the amicus curiae brief filed by the Connecticut Association of Municipal Attorneys emphasizes that the city's attorneys were placed in an "untenable" position, as Ganim had denied the allegations and had continued to serve as mayor during the federal criminal proceedings, at which time he was presumed innocent. These arguments ring hollow to us. The indictment was available when the city proceeded voluntarily with the arbitration. The city, on notice of potential illegality that could well have a drastic effect on the enforceability of the contract at issue; see footnote 15 of this opinion; could well have refused to participate in the arbitration and brought a declaratory judgment action or applied for

to preserve its objection to or stay the arbitration proceedings pending developments with respect to facts alleged in the indictment. Moreover, the record indicates that, when the panel reconsidered its improper initial determination as to subject matter jurisdiction, as well as its timeliness ruling, and offered the city the chance to present its illegality claim, the city did not avail itself of that opportunity to go on the record to present or to preserve its right to make that claim.[28] Accordingly, we conclude that the trial court properly found that the city's actions before the panel constituted a waiver of this claim.

## C

### Whether the Panel's Improper Subject Matter Jurisdiction Ruling Rendered the Award Incomplete or Defective

The city correctly notes that the panel's conclusion on the face of the award that it lacked subject matter jurisdiction over the contract illegality claim conflicts with the trial court's conclusion, which was upheld by this court, that such a claim was within the jurisdictional ken of the arbitrators.[29] See part I A of this opin-

a stay of the proceedings, which would have had the effect of forcing Klewin to move to compel arbitration pursuant to § 52-410. See *Nussbaum* v. *Kimberly Timbers, Ltd.*, supra, 271 Conn. 68–70.

[28] We note that the city characterizes Klewin's reliance on the claimed waiver following the off-the-record discussion with the panel in November, 2003, as an improperly raised alternate ground for affirmance. We disagree with this characterization. Although the trial court's memorandum of decision appears to conflate the city's arguments with respect to its arbitral misconduct claims and the illegality of contract claims, it is clear that the trial court considered this development in its review of the proceedings before the panel, and it is properly before us on appellate review.

[29] Specifically, the arbitration award provided: "The panel had stated previously on the record that the issues concerning the illegality of the contract because of alleged [Connecticut Unfair Trade Practices Act] violations and other illegal acts as stated in [the city's] [c]ounterclaim and [a]ffirmative [d]efenses would not be considered by the [p]anel because [the city's] pleading was: (a) filed too late, being twenty months after the date of . . . Ganim's indictment when facts to support this argument were known, or should

ion. The city further contends that, since the panel concluded that it lacked subject matter jurisdiction over the illegality claim, and it in fact did have such jurisdiction, the award is incomplete, and therefore fatally defective as not final or definite. See General Statutes § 52-418 (a) (4). We disagree.

If the record in this case were as simple as the city apparently envisions, reversal and vacatur of the award would in fact be required because the panel would have executed its powers in an incomplete and defective manner. The city gives short, or no, shrift, however, to the fact that the panel also emphasized in the award that the city's amended pleading was untimely because it had been filed twenty months after the indictment of Ganim. Moreover, on the record of this case, the city's claim is unavailing because the panel did in fact offer the city the opportunity to submit its illegality claim, however untimely, for resolution. By not pursuing that opportunity further before the panel, the city waived that claim. See part I B of this opinion. This waiver rendered the panel's incorrect legal determination, in effect, harmless error not requiring vacatur of the award.[30]

have been known by [the city]; and that (b) to give credence to [the city's] argument that the [c]ontract was void ab initio would deprive the [p]anel of its jurisdiction."

[30] The city also argues that vacatur is required because the panel's determination that it lacked subject matter jurisdiction over its contract illegality claims, however incorrect, "effectively rendered moot [the] finding of untimeliness" as to when the city raised that claim. Inasmuch as we conclude that the city waived this claim when the panel finally and correctly offered to exercise its jurisdiction over the illegality claims; see part I B of this opinion; that determination by the panel was, at worst, harmless error not requiring vacatur of the award. See *Metropolitan District Commission* v. *AFSCME, Council 4, Local 184*, 237 Conn. 114, 119, 676 A.2d 825 (1996) ("[e]very reasonable presumption . . . will be made in favor of the [arbitral] award and of the arbitrators' acts and proceedings" [internal quotation marks omitted]); *International Brotherhood of Teamsters* v. *Shapiro*, 138 Conn. 57, 63, 82 A.2d 345 (1951) (arbitration panel's improper consideration of duress in formation of agreement "had no effect upon the awards which it legally could make").

## D

## Whether the City's Waiver of the Illegal Contract Defense Before the Panel Affected Its Right to Claim that the Arbitration Award Should Be Vacated on Public Policy Grounds

The city next contends that the trial court improperly concluded that the city waived its right to assert that arbitral enforcement of the illegally procured CM agreement would violate public policy. Citing our decision in *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, 252 Conn. 416, 747 A.2d 1017 (2000), the city argues that, because the public policy claim was raised in a timely application to vacate the award, it was not subject to waiver since the court engages in de novo review in a public policy challenge to an arbitration award. The city, with the support of the amici curiae, namely, the state of Connecticut, the Connecticut Association of Municipal Attorneys and the Connecticut Conference of Municipalities, further argues that the panel's award in this case violated the public policy against corruption in municipal contracting because it enforced an agreement that was the product of improper conflicts of interest that violated applicable state statutes and ethics ordinances. In response, Klewin contends that the city's arguments conflate two issues: (1) whether enforcement of an arbitration award, which deals with the lawfulness of the award itself, violates public policy; and (2) whether the contract underlying the award violates public policy because of its terms or the manner in which it was procured. Klewin claims that, because there is nothing facially illegal about the contract or the award, its enforcement would not violate public policy, and that attacks on the legality of the underlying contract are exclusively within the province of the panel. Accordingly, Klewin argues that the city's claim is merely an improper relabeling of its contract illegality defense.

We conclude that, on this record, the city's public policy claim is functionally indistinguishable from its contract illegality defense, and because the city waived its opportunity to present that claim before the panel, the trial court properly determined that the city had waived its public policy claim because there was no factual predicate under which it could be reviewed.

Whether the trial court properly concluded that the city's public policy claim was subject to the waiver doctrine presents a question of law, over which our review is plenary. See *LaSalla* v. *Doctor's Associates, Inc.*, 278 Conn. 578, 586, 898 A.2d 803 (2006) ("[w]e agree with the defendant that the proper scope of review, in both the trial court and this court, for a colorable claim that an award violated public policy is plenary").

"A court's refusal to enforce an arbitrator's award . . . because it is contrary to public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy." *United Paperworkers International Union, AFL-CIO* v. *Misco, Inc.*, 484 U.S. 29, 42, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987). "This rule is an exception to the general rule restricting judicial review of arbitral awards." *MedValUSA Health Programs, Inc.* v. *Memberworks, Inc.*, 273 Conn. 634, 655, 872 A.2d 423, cert. denied sub nom. *Vertrue, Inc.* v. *MedValUSA Health Programs, Inc.*, 546 U.S. 960, 126 S. Ct. 479, 163 L. Ed. 2d 363 (2005). "The exception, however, is narrowly construed and . . . is limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." (Internal quotation marks omitted.) Id. To be vacated under the narrow public policy exception, "the award

must be *clearly* illegal or *clearly* violative of a strong
public policy." (Emphasis in original; internal quotation
marks omitted.) Id., 656. "Furthermore, [t]he party chal-
lenging the award bears the burden of proving that
illegality or conflict with public policy is clearly demon-
strated." (Internal quotation marks omitted.) Id.; see
also id., 641, 654 (concluding that Connecticut does
not have explicit, well-defined public policy prohibiting
excessive punitive damages awards, and that judicial
confirmation process was not state action for purposes
of due process clause protections against excessive
punitive damages).

Judicial review of whether an arbitration award vio-
lates public policy is de novo, but not completely unfet-
tered. The legal determination of whether a particular
award violates public policy necessarily depends on the
facts found by the arbitrator during those proceedings.
For example, in *Schoonmaker* v. *Cummings & Lock-
wood of Connecticut, P.C.*, supra, 252 Conn. 416, a case
involving a public policy challenge under rule 5.6 of the
Rules of Professional Conduct to a partnership
agreement provision that had conditioned the receipt of
retirement benefits on compliance with a noncompete
clause, we concluded that "when an arbitrator has been
called upon to determine whether an . . . agreement
violates a legitimate and clearly established public pol-
icy, such as that underlying rule 5.6, de novo review is
proper"; id., 426; because the determination of "whether
. . . there exists a public policy mandate with which
an arbitral award must conform . . . indisputably
involves an issue of law properly resolved by an exer-
cise of this court's plenary authority." (Citations omit-
ted; internal quotation marks omitted.) Id., 428–29
(discussing expressions of public policy in statutes,
case law or administrative regulations). We also stated
that once "it has been determined that an arbitral award
does implicate a clearly established public policy, the

ultimate question remains as to whether the award itself comports with that policy"; id., 429; and concluded that judicial review of that determination is de novo. Id. In noting that "courts have greater expertise and knowledge than arbitrators" in "the identification and application of the public policy of this state"; id., 430; we emphasized that "a reviewing court [is] better suited to evaluate whether *certain facts, as found by the arbitrator*, comport with the specific public policy that is at issue." (Emphasis added.) Id.

Indeed, in *Schoonmaker*, we emphasized our adherence "to the long-standing principle that findings of fact are ordinarily left undisturbed upon judicial review. Thus, in the present case, we defer to the arbitrator's interpretation of the agreements regarding the scope of the forfeiture upon competition provision, as well as the terms upon which postemployment benefits are offered to former employees. We conclude only that as a reviewing court, we must determine, pursuant to our plenary authority and giving appropriate deference to the arbitrator's factual conclusions, whether the forfeiture provision in question violates those policies." Id., 432; see also *State* v. *AFSCME, AFL-CIO, Council 4, Local 2663*, 257 Conn. 80, 95, 777 A.2d 169 (2001) ("To the extent that the plaintiff claims that the award violated public policy because the arbitrator misapplied the [contract's] definition of salaried employee, we decline to undertake judicial review of the arbitrator's factual determinations in interpreting the terms of the contract. The arbitrator made a factual determination that commission staff attorneys are hourly, rather than salaried employees."); *Groton* v. *United Steelworkers of America*, 254 Conn. 35, 51–52, 757 A.2d 501 (2000) (noting that legal system "ordinarily" gives "great deference . . . to both the factual and legal determinations of the arbitrators," and that even in a de novo public

policy challenge, "we give deference to the arbitrator's factual determinations" [citations omitted]).[31]

Whether an arbitration award violates the public policy against corruption in governmental contracting turns on a subsidiary factual determination that the underlying contract was illegally procured. This determination is fundamentally indistinguishable from resolution of the defense that the contract is void ab initio on grounds of illegality. This type of public policy claim is, therefore, especially dependent on arbitral findings of fact, which, as previously discussed, on which we both rely and defer to. In this regard, we find instructive Justice Vertefeuille's dissenting opinion in *Bridgeport* v. *Kasper Group, Inc.*, 278 Conn. 466, 899 A.2d 523 (2006). In that case, Justice Vertefeuille, in addressing a proffered alternate ground for affirmance,[32] namely,

---

[31] We note that our deference to and reliance on arbitral factual findings, even in the public policy arena, accords with the approach taken by other jurisdictions. See, e.g., *United Paperworkers International Union, AFL-CIO* v. *Misco, Inc.*, supra, 484 U.S. 45 ("The parties did not bargain for the facts to be found by a court, but by an arbitrator chosen by them who had more opportunity to observe [the employee who had possessed marijuana] and to be familiar with the plant and its problems. Nor does the fact that it is inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task."); *North Adams Regional Hospital* v. *Massachusetts Nurses Assn.*, 889 F. Sup. 507, 515 (D. Mass. 1995) ("[c]ourt's consideration of the [h]ospital's public policy argument does not automatically empower the [c]ourt to find its own facts"), aff'd, 74 F.3d 346 (1st Cir. 1996); *New York State Correctional Officers & Police Benevolent Assn.* v. *State*, 94 N.Y.2d 321, 327, 726 N.E.2d 462, 704 N.Y.S.2d 910 (1999) (in making public policy determination, "the issue before this [c]ourt is not whether we agree with the arbitrator's assessment of the evidence, interpretation of the contract or reasoning in fashioning the award").

[32] In *Bridgeport* v. *Kasper Group, Inc.*, supra, 278 Conn. 467–68, the majority concluded that the trial court had properly vacated an arbitration award under § 52-418 (a) (3) because the arbitrator had committed misconduct by denying the city's motions to stay the proceedings and submit additional "pertinent and material evidence" with respect to its claim that the design contract at issue was void ab initio because it had been procured illegally. We concluded that the trial court properly determined that the arbitrator's denial of these motions to stay the proceedings until the end of the related criminal trial and to supplement the record with excerpts of testimony from

that enforcement of an arbitration "award would violate the public policy against enforcing a contract that was illegally procured"; id., 495; concluded that, "even if I . . . were to assume, arguendo, that there exists an explicit, well-defined, and dominant public policy against enforcing illegally procured contracts, I would defer to the arbitrator's factual findings under this court's standard of review of the narrow public policy exception. . . . Thus, I would not review the correctness of the finding, implicit in the arbitrator's award, that the contract was not illegally procured. . . . The plaintiff contended throughout the arbitration that the [school construction] contract was illegally procured. The arbitrator's award in favor of the defendant reveals his clear rejection of this defense. Even if I were to consider the evidence excluded by the arbitrator, I would nevertheless conclude that this evidence was insufficient to prove clearly that the [school construction] contract was obtained illegally."[33] (Citations omitted.) Id., 499 (*Vertefeuille, J.,* dissenting).

---

that trial constituted misconduct requiring vacatur of the award, because that trial testimony was "central to the plaintiff's case" as relevant, noncumulative direct evidence of illegality. Id., 481–84.

Justice Vertefeuille dissented, concluding that, although the proffered testimony was relevant and not cumulative, the city was not substantially prejudiced by its exclusion in light of other evidence already in the record. Id., 486. Accordingly, because Justice Vertefeuille would have reversed the judgment of the trial court, she considered the city's alternate grounds for affirmance. Id.

[33] Justice Vertefeuille also addressed the city's claim that "enforcement of the award would violate the public policy against binding a municipality to an agreement entered into by its unauthorized agent." *Bridgeport* v. *Kasper Group, Inc.,* supra, 278 Conn. 494–95 (*Vertefeuille, J.,* dissenting). Relying on *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.,* supra, 252 Conn. 429, she rejected this claim and concluded that, "even if I were to assume, arguendo, that this state has an explicit, well-defined, and dominant public policy against enforcing contracts entered into by a municipality's agent who lacked the authority to bind the municipality, the plaintiff's claim seeks to disturb the arbitrator's factual findings in violation of this court's traditional deference to the arbitrator's factual findings." *Bridgeport* v. *Kasper Group, Inc.,* supra, 496 (*Vertefeuille, J.,* dissenting). She noted that, although the arbitrator had not set forth his findings of fact,

In the present case, as in *Kasper Group, Inc.*, the nature of the public policy claim renders it particularly fact bound and inextricably linked to the illegal contract defense; indeed, they are one and the same.[34] Thus,

the award of contract damages "indicates that he found, as a factual matter, a breach of either an express or implied in fact contract," and therefore, "necessarily found that the committee had either the implied or apparent authority to bind the municipality." Id., 496–97 (*Vertefeuille, J.*, dissenting).

Indeed, Justice Vertefeuille emphasized that "[d]eclining to review the factual findings of an arbitrator is consistent with our admonition to construe narrowly the public policy grounds for vacating arbitration awards lest this exception swallow this court's rule of deference to arbitrators' determinations. . . . If this court were to engage in a review of the arbitrator's factual findings each time a dissatisfied party to an arbitration could make a colorable claim that the award implicates an explicit, well-defined, and dominant precedent of our case law, then an arbitrator's award would likely mark the beginning of litigation and not the resolution of the parties' dispute." (Citation omitted.) Id., 498 (*Vertefeuille, J.*, dissenting).

[34] Citing *Haynes Construction Co.* v. *Cascella & Son Construction Co.*, 36 Conn. App. 29, 647 A.2d 1015, cert. denied, 231 Conn. 916, 648 A.2d 152 (1994), Klewin claims that because the terms and purpose of the CM agreement are not illegal, judicial enforcement of an arbitration award rendered pursuant thereto would not violate public policy. In *Haynes Construction Co.*, the Appellate Court concluded that the trial court improperly determined that arbitral enforcement of a construction subcontract would violate public policy because the subcontractor's payment arrangement with its workers violated prevailing wage statutes. Id., 40. The Appellate Court noted that the agreement "was simply a contract by the defendant to render certain subcontracting services to the plaintiff" and that the "contract contains no mention whatever of payment of the prevailing wages, nor was it necessary to prove the illegal wage payment plan in order to prove the defendant's claim in the arbitration proceedings." Id. The court concluded that, "[a]s the purpose of the contract was legal, enforcing it by way of an arbitration award would not violate public policy. Indeed, failure to enforce the contract would be much more frustrating of public policy. Allowing the plaintiff to escape liability after breaching the contract would mean that it would not be required to produce the very funds that the defendant and its employees relied on for payment of the prevailing wages." Id., 40–41.

In our view, Klewin's argument takes an improperly circumscribed view of the public policy exception. The public policy implications in *Haynes Construction Co.* were tangential to the subcontract at issue. In the present case, the city's public policy challenge arises directly from the circumstances surrounding the formation and enforceability of the CM agreement. Presented with an appropriately developed factual record, the public policy challenge in this case properly would have been before the judicial authority.

when the city waived the illegal contract defense before the panel; see part I B of this opinion; it necessarily deprived the trial and reviewing courts of the factual findings necessary to decide that claim in the context of a public policy challenge, even assuming the existence of a strong, well-defined public policy against corruption in the procurement of public contracts.[35]

We are, however, "mindful . . . that the arbitration under review is complicated by the fact that it involves public funds and the question of whether the city had a full and fair opportunity to contest the use of such funds for purposes of illegal dealings. Although we do not advocate different rules to govern such arbitrations, we must remain vigilant in ensuring that the efficiency and economics generally associated with arbitrations do not swallow the public interest that has been compromised as a result of the arbitrator's misconduct."[36]

---

[35] The city's reliance on the conclusion in *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, supra, 252 Conn. 430, that a public policy challenge may be raised for the first time before the trial court is overbroad. Although we have not required that *all* such claims be raised first before the arbitral authority, that determination depends on the nature of the public policy challenge, as "often the question of whether [an] award [violates public policy] will not arise until after the award has been rendered. . . . Thus, in such a case, there would be no reason to defer to the arbitrator regarding a question that might not have been considered in the arbitration proceeding." (Citations omitted.) Id. Indeed, public policy cases frequently are characterized by straightforward, if not undisputed, facts that present classic questions of law for this court. See, e.g., *Groton* v. *United Steelworkers of America*, supra, 254 Conn. 36–37 (trial court properly vacated arbitration award reinstating employee who had been convicted of embezzlement of his employer's funds following plea of nolo contendere because award had violated public policy against embezzlement found in relevant criminal statute, General Statutes § 53a-119 [1]). The present case is, however, distinguishable from these cases because, although ascertaining statutory or other bases for a policy against illegality in the procurement of municipal public works contract is readily within the domain of the courts, that policy nevertheless must be applied to the facts of a particular case, the finding of which remains the province of the arbitrator.

[36] The Connecticut Conference of Municipalities contends in its amicus curiae brief that "[r]ecent scandals involving state and local officials highlight the problem of corruption and the need to safeguard the public interest and

*Bridgeport* v. *Kasper Group, Inc.*, supra, 278 Conn. 486. In the present case, having already concluded that factual development of the contract illegality issue solely was committed to the panel, to then conclude that the trial court was required to hold extensive hearings, essentially amounting to a trial, in a confirmation proceeding addressing that identical issue in the guise of a public policy challenge would vitiate that first conclusion. Put differently, we decline to accept what we view as the city's invitation to turn public policy challenges into the arbitration equivalent of a "mulligan"[37] by inviting de novo *factual* review of illegal contract issues. See *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, supra, 252 Conn. 429 n.7 ("[A] party raising such a challenge to an arbitral award may not succeed in receiving de novo review merely by labeling its challenge as falling within the public policy exception to the normal rule of deference. The substance, not the form, of the challenge will govern."). Accordingly, we conclude that, when the city waived the illegal contract defense before the panel; see part I B of this opinion; it also deprived the court of the factual basis necessary to consider that same claim in the context of a public policy challenge.

II

## WHETHER THE TRIAL COURT PROPERLY DENIED THE CITY'S MOTIONS FOR AN EVIDENTIARY HEARING AND FOR REARGUMENT

The city next argues that the trial court improperly denied its motion for an evidentiary hearing to resolve

purse against misuse of public trust and funds." Its arguments, and those of the other amici curiae, suffer, however, from the same deficiency as do the city's claims, namely, that the factual predicate for this public policy challenge does not exist in this case because of the plaintiff's conduct of its defense in the underlying arbitration.

[37] "A 'mulligan' is 'a free shot sometimes awarded a golfer in nontournament play when the preceding shot has been poorly played.'" *Bortner* v. *Woodbridge*, 250 Conn. 241, 256 n.15, 736 A.2d 104 (1999), quoting Webster's Third New International Dictionary (1971).

the disputed jurisdictional facts at issue, namely, the circumstances surrounding the illegal contract procurement, which went to the panel's subject matter jurisdiction. Klewin contends in response that this claim was not raised adequately before the trial court, and further is a "red herring" because the factual issues were within the jurisdiction of, and waived before, the panel.

The city correctly points out that "[w]hen issues of fact are necessary to the determination of a court's jurisdiction, due process requires that a trial-like hearing be held, in which an opportunity is provided to present evidence and to cross-examine adverse witnesses." (Internal quotation marks omitted.) *Schaghticoke Tribal Nation* v. *Harrison*, 264 Conn. 829, 833, 826 A.2d 1102 (2003). In the present case, we already have concluded that all of the factual issues surrounding the allegedly illegal procurement of the contract were firmly committed to the panel in the first instance, notwithstanding their import to a subsequent public policy determination. See part I A and D of this opinion. Because the city waived its right to present those factual issues by its conduct before the panel; see part I B of this opinion;[38] the trial court did not improperly deny its motion for an evidentiary hearing, and did not abuse its discretion by denying the city's subsequent motion for reargument on this point.[39]

---

[38] The city claims that, had the trial court held a hearing, it would have presented evidence supporting the reasons for its delay in raising the illegality defense, including concealment by Klewin and interference by Ganim, who had continued to hold office until his conviction on other federal corruption charges. We conclude that this evidence is of no moment because, when the panel finally afforded the city the opportunity to present this evidence, the city did not take advantage of that opportunity. See part I B of this opinion.

[39] "A motion to reargue is not a device to obtain a second bite of the apple or to present additional cases or briefs which could have been presented at the time of the original argument. . . . Rather, reargument is proper when intended to demonstrate to the court that there is some . . . principle of law which would have a controlling effect, and which has been overlooked . . . ." (Citation omitted; internal quotation marks omitted.) *Durkin Village*

## III

## WHETHER THE PANEL PROPERLY PROCEEDED WITH ONLY TWO ARBITRATORS AFTER A VACANCY DEVELOPED

The city next claims that the trial court should have vacated the arbitration award because the arbitrators lacked subject matter jurisdiction as the panel only had two members, rather than the agreed upon three members. The city claims that the parties had agreed at the outset of the arbitration that a balanced panel of three arbitrators was required, thus requiring departure from the association's commercial arbitration rules that permit an incomplete panel to continue with an arbitration. In response, Klewin argues that the issue of whether to proceed with two arbitrators was committed to the panel, which decided that issue correctly. We agree with Klewin, and conclude that, after a vacancy developed on the panel during the proceedings, the arbitrators properly continued the proceedings with a panel of two members.

The record reveals the following additional facts and procedural history. In June, 2001, the city requested that the association select a panel of three arbitrators in accordance with the commercial arbitration rules for large, complex disputes that would include an experienced construction attorney, an experienced design professional and an experienced contractor; the letter noted specifically that "[b]y agreement with [Klewin's attorney], we request that you use the construction industry panel for purposes of selection of the panel." Subsequently, in February, 2002, prior to commencement of the hearings, the attorney member, Edwin Hebb, withdrew from the panel for personal reasons.

*Plainville, LLC* v. *Cunningham*, 97 Conn. App. 640, 656, 905 A.2d 1256 (2006). "We review a trial court's decision on such matters for an abuse of discretion." Id., 655.

In March, 2002, the parties agreed that Attorney Peter Lawson Kennedy would replace Hebb on the panel, and serve as chairperson.

Thereafter, the hearings commenced, but, in September, 2002, Frank Juliano, another member of the panel, resigned because of illness. At that point, the parties disagreed about whether to proceed with the remaining two arbitrators, with only Klewin favoring that course of action. Relying on rule R-21 (b) of the association's commercial dispute resolution procedures,[40] the arbitrators elected to continue with the proceedings with a two member panel, concluding that the parties had not " 'agree[d] otherwise' " in accordance with the rules.[41] Thereafter, the city renewed its objection and participated in the subsequent hearings under protest.

The trial court concluded that, under the arbitration rules, it properly was in the purview of the panel to determine whether the vacancy should be filled.[42] The

[40] Rule R-21 of the association's commercial dispute resolution procedures provides: "(a) If for any reason an arbitrator is unable to perform the duties of the office, the [association] may, on proof satisfactory to it, declare the office vacant. Vacancies shall be filled in accordance with the applicable provisions of these rules.

"(b) In the event of a vacancy in a panel of neutral arbitrators after the hearings have commenced, the remaining arbitrator or arbitrators may continue with the hearing and determination of the controversy, unless the parties agree otherwise.

"(c) In the event of the appointment of a substitute arbitrator, the panel of arbitrators shall determine in its sole discretion whether it is necessary to repeat all or part of any prior hearings."

[41] Indeed, during this time, in September, 2002, the city sought an ex parte temporary injunction from the trial court to prohibit the arbitration from proceeding before a panel of only two arbitrators. The trial court, *Sheedy, J.*, denied the application, concluding that the court lacked jurisdiction over the matter, which was properly pending before the panel.

[42] The trial court noted rule R-8 (a) of the association's commercial dispute resolution procedures, which provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement," and rule R-55 of the association's commercial dispute resolution procedures, which provides in relevant part that "[t]he arbitrator shall interpret and apply these rules insofar as they relate to the arbitrator's powers and duties. . . ."

trial court further noted that, because the parties' arbitration clause did not expressly or specifically establish the composition of the panel, the panel properly interpreted the association's rules to permit the use of only two arbitrators. The court also concluded that the letter from the city requesting that the panel be selected in accordance with the rules for large commercial disputes, which would require three arbitrators, indicated that Klewin had agreed to those rules only for purposes of the selection of the initial panel. The court also rejected the city's argument that Klewin's acquiescence to filling the first vacancy corroborated the existence of such an agreement, indicating that it was only evidence of such an agreement to a panel of three on that particular occasion.

Whether the panel had the authority, under the agreement of the parties and the applicable association rules, to proceed with two arbitrators after a vacancy had developed raises an issue of whether the panel exceeded its powers, a ground for vacatur under § 52-418 (a) (4). This presents a question of law over which we exercise plenary review. See, e.g., *Harty* v. *Cantor Fitzgerald & Co.*, 275 Conn. 72, 84, 881 A.2d 139 (2005).

An agreement about the initial composition of an arbitration panel is distinct conceptually from an agreement about how to address vacancies on that panel, and the association's rules incorporated by reference into an arbitration clause properly are the subject of interpretation by the arbitration panel. *Bernstein* v. *On-Line Software International, Inc.*, 232 App. Div. 2d 336, 337, 648 N.Y.S.2d 602 (1996), appeal denied, 89 N.Y.2d 810, 678 N.E.2d 1354, 656 N.Y.S.2d 738 (1997). Moreover, in the absence of a specific agreement as to the composition of the arbitration panels, which signi-

fies an "agreement otherwise" by the parties, a panel of three neutral arbitrators properly may continue with fewer than three members if a vacancy arises on the panel. Id., 336–37; see *Board of Neosho County Commissioners* v. *Central Air Conditioning Co.*, 235 Kan. 977, 979–80, 683 P.2d 1282 (1984); *MMR-Radon Constructors, Inc.* v. *Continental Ins. Co.*, 714 So. 2d 1, 9 (La. App.), review denied, 721 So. 2d 915 (La. 1998); *Wiekhorst Bros. Excavating & Equipment Co.* v. *Sanitary & Improvement District No. 337*, 232 Neb. 377, 379, 440 N.W.2d 488 (1989); cf. *Szuts* v. *Dean Witter Reynolds, Inc.*, 931 F.2d 830, 831–32 (11th Cir. 1991) (vacating award because arbitration improperly continued with two arbitrators when parties' arbitration agreement specifically required panel of three).

Having reviewed the record, we conclude that the trial court properly determined that the parties' arbitration agreement did not contemplate any variation from the association's rules with respect to panel vacancies arising during the course of hearings. The CM agreement's arbitration clause stated in relevant part only that unresolved disputes "shall be submitted to the American Arbitration Association for resolution in accordance with its commercial rules of arbitration then in effect," and does not prescribe specifically the composition of the panel. See footnote 6 of this opinion. Moreover, the correspondence of the parties does not evince any particular agreement as to the handling of subsequent vacancies on the panel. Accordingly, how to proceed in the event of a vacancy was an issue squarely within the authority of the panel, and the trial court, therefore, properly concluded that the association's rules permitted the panel to proceed with two arbitrators after a vacancy had developed.

IV

CROSS APPEAL:

WHETHER OFFER OF JUDGMENT INTEREST IS AVAILABLE IN PROCEEDINGS TO CONFIRM ARBITRATION AWARDS

Finally, we consider Klewin's cross appeal, in which it claims that the trial court improperly failed to add offer of judgment interest to the judgment in this case pursuant to § 52-192a. In response, the city, relying on, inter alia, *Nunno* v. *Wixner*, 257 Conn. 671, 778 A.2d 145 (2001), claims that arbitration confirmation proceedings are not "civil actions" within the meaning of § 52-192a. We decline to reach this claim because the trial court did not rule on it, rendering the record inadequate for review.

In its application to confirm the award, Klewin noted that it had filed an offer of judgment during the arbitration proceedings in the amount of $5,800,000, which the city rejected. In its claim for relief, Klewin then requested offer of judgment interest pursuant to § 52-192a, in addition to confirmation of the award. Thereafter, the trial court rendered judgment confirming the award, but neither the memorandum of decision nor the judgment file make any mention of Klewin's claim for offer of judgment interest. We also note that there are no postjudgment motions, such as a motion for articulation or rectification; see Practice Book § 66-5;[43]

---

[43] Practice Book § 66-5 provides in relevant part: "A motion seeking corrections in the transcript or the trial court record or seeking an articulation or further articulation of the decision of the trial court shall be called a motion for rectification or a motion for articulation, whichever is applicable. Any motion filed pursuant to this section shall state with particularity the relief sought. . . .

"The appellate clerk shall forward the motion for rectification or articulation and the opposition, if any, to the trial judge who decided, or presided over, the subject matter of the motion for rectification or articulation for a decision on the motion. If any party requests it and it is deemed necessary by the trial court, the trial court shall hold a hearing at which arguments may be heard, evidence taken or a stipulation of counsel received and

or a motion to open the judgment; see General Statutes § 52-212a;[44] or a motion to correct the judgment; see, e.g., *Connecticut National Bank* v. *Gager*, 263 Conn. 321, 326, 820 A.2d 1004 (2003);[45] addressing the issue of offer of judgment interest.

"As is always the case, the [appellant], here the [defendant], bear[s] the burden of providing a reviewing court with an adequate record for review. . . . It is, therefore, the responsibility of the appellant to move for an articulation or rectification of the record where the trial court has failed to state the basis of a decision

approved. The trial court may make such corrections or additions as are necessary for the proper presentation of the issues raised or for the proper presentation of questions reserved. The trial judge shall file the decision on the motion with the appellate clerk.

"Nothing herein is intended to affect the existing practice with respect to opening and correcting judgments and the records on which they are based. The trial judge shall file any such order changing the judgment or the record with the appellate clerk. . . .

"The sole remedy of any party desiring the court having appellate jurisdiction to review the trial court's decision on the motion filed pursuant to this section or any other correction or addition ordered by the trial court during the pendency of the appeal shall be by motion for review under Section 66-7. . . ."

[44] General Statutes § 52-212a provides in relevant part: "Unless otherwise provided by law and except in such cases in which the court has continuing jurisdiction, a civil judgment or decree rendered in the Superior Court may not be opened or set aside unless a motion to open or set aside is filed within four months following the date on which it was rendered or passed. . . ."

[45] "We begin by reviewing the law concerning the correction of judgments. There is a distinction between corrections that change the substance of a court's disposition and corrections that merely remedy clerical errors. . . . [T]he distinction [is] that mere clerical errors may be corrected at any time even after the end of the term. . . . A clerical error does not challenge the court's ability to reach the conclusion that it did reach, but involves the failure to preserve or correctly represent in the record the actual decision of the court. . . . In other words, it is clerical error if the judgment as recorded fails to agree with the judgment in fact rendered . . . . Thus, a motion to correct properly is granted when the moving party demonstrates that the recorded judgment is inconsistent with the actual judgment. . . . A finding of an inconsistency between the recorded judgment and the actual judgment necessarily requires that the actual judgment be unambiguous and clearly ascertainable." (Citations omitted; internal quotation marks omitted.) *Connecticut National Bank* v. *Gager*, supra, 263 Conn. 326.

. . . to clarify the legal basis of a ruling . . . or to ask the trial judge to rule on an overlooked matter. . . . In the absence of any such attempts, we decline to review this issue." (Citations omitted; internal quotation marks omitted.) *Grimm* v. *Grimm*, 276 Conn. 377, 388–89, 886 A.2d 391 (2005), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006); see also, e.g., Practice Book § 61-10 ("[i]t is the responsibility of the appellant to provide an adequate record for review"); Practice Book § 66-5 (motion for articulation). Thus, we will not engage in the "inappropriate task of speculating about the trial court's reasoning" by reviewing Klewin's cross appeal. *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 233, 828 A.2d 64 (2003); id. (declining to reach various statute of limitations claims raised by plaintiffs' motions for additur and to set aside verdict when "[t]he draft judgment file contains only a general denial of the plaintiffs' motions, and the trial court did not discuss the statute of limitations issues in rendering its oral decision . . . [and] the plaintiffs never remedied this defect in the record by moving for articulation or rectification of the trial court's decision"); see also *Heaven* v. *Timber Hill, LLC*, 96 Conn. App. 294, 312, 900 A.2d 560 (2006) (declining to review claim that trial court improperly granted plaintiff's motion for offer of judgment interest because "[f]rom the trial court record, it is not clear why the court awarded the plaintiff offer of judgment interest on the basis of the 'renewed offer of judgment,' which had apparently been withdrawn . . . [since] [t]he defendant . . . did not file a motion for articulation seeking an explanation from the court as to the basis for its finding that the renewed offer of judgment was still valid").

Inasmuch as none of the parties' numerous memoranda of law to the trial court mention this issue, which was raised solely in the initial application to confirm the award, it may well have been overlooked in the

court's admirable efforts to rule on claims actually raised in hundreds of pages of briefs, contained in a voluminous file with thousands of pages of transcripts and exhibits. Moreover, as we previously noted, Klewin never filed any kind of postjudgment motion that would have brought to the trial court's attention this potentially overlooked request. Accordingly, we decline to consider this sole claim in Klewin's cross appeal.[46]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[16] Klewin claims that, because the city never objected to its request for offer of judgment interest, the trial court was obligated to award offer of judgment interest as a "nondiscretionary, ministerial act." See, e.g., *Cardenas* v. *Mixcus*, 264 Conn. 314, 321, 823 A.2d 321 (2003) ("an award of interest under § 52-192a is mandatory, and the application of § 52-192a does not depend on an analysis of the underlying circumstances of the case or a determination of the facts" [internal quotation marks omitted]). We disagree. Because the application of § 52-192a in voluntary arbitration proceedings is heretofore uncharted waters, other legal issues also remain as to, for example, whether the interest would begin to run when the offer of judgment was first filed in the underlying arbitration, or upon commencement of the confirmation proceedings. This renders a trial court ruling, which was not present in this case, particularly crucial to our review of this issue. In any event, a party's failure to respond to a discrete legal argument in the context of a judicial proceeding is not necessarily a concession of its validity. Cf. *Harris* v. *Commissioner of Correction*, 271 Conn. 808, 841–42 n.24, 860 A.2d 715 (2004) ("[t]here is no rule, however, that an appellee's failure to reply in its brief to an issue raised by the appellant is an implicit concession that the appellant's claim is meritorious and that the claim should be decided in the appellant's favor").